UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MARK  KEATON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:12-cv-00641-SEB-MJD |
| | ) | |
| DAVE  HANNUM, LESLIE  SLONE, | ) | |
| CHRISTINE  ZOOK, REBA  GARDNER, | ) | |
| JACKIE  DAKICH, | ) | |
| | ) | |
| Defendants. | ) | |

**Entry Granting Defendants Hannum's and Slone's Motion for Summary Judgment**

Plaintiff Mark Keaton, an Indiana lawyer, was arrested and prosecuted for stalking his ex-girlfriend, defendant Christine Zook. Keaton claims that the charges were nonsense and in retaliation for Keaton having composed and published a blog about his relationship with Zook. The State eventually dismissed the charges and Keaton filed this action pursuant to 42 U.S.C. § 1983 against the individuals involved with his arrest and criminal prosecution. The claims alleged against Indiana University Police Department officers, Detective Dave Hannum and Sergeant Leslie Slone, are the focus of the present motion. These officers seek resolution of the claims alleged against them through summary judgment.

For the reasons explained below, defendant Hannum's and Slone's motion for summary judgment [dkt. 135] is **granted.**

1

## I. Remaining Claims Against Hannum and Slone

Keaton raises four § 1983 claims against Hannum and Slone in his amended complaint. Dkt. 7. Each of these counts includes a claim that the defendants conspired to violate Keaton's constitutional rights. In the Entry Granting Defendant Zook's Motion for Summary Judgment issued this same day, the Court holds that Keaton has produced no evidence supporting his claim that Zook entered a conspiracy with state officials to violate Keaton's constitutional rights. For the reasons explained in that Entry, defendants Hannum and Slone are also entitled to summary judgment on the conspiracy claim. In addition, the conspiracy matters only with respect to defendant Zook, a private actor, because the other defendants "are state actors, and thus amenable to suit under 42 U.S.C. § 1983, by virtue of their offices." *Logan v. Wilkins,* 644 F.3d 577, 583 (7th Cir. 2011) (*citing Hoskins v. Poelstra*, 320 F.3d 761, 764 (7th Cir. 2003). For these reasons, the conspiracy claims require no further discussion.

Count II has been abandoned by Keaton. He specifically concedes that summary judgment must be entered in favor of the defendants on his due process claim. See dkt. 215 at p. 29. Accordingly, no further analysis is necessary as to Count II.

The claims remaining for resolution in this action are the following: 1) Count I alleges that Keaton was falsely arrested; 2) Count III alleges the violation of Keaton's equal protection rights; and 3) Count IV alleges the violation of Keaton's First Amendment rights.

## II. Standard of Review

A motion for summary judgment asks that the Court find that a trial based on the uncontroverted and admissible evidence is unnecessary because, as a matter of law, it would conclude in the moving party's favor. *See* Fed. R. Civ. Pro. 56. To survive a motion for summary

judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. Pro. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. Pro. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. Pro. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially the grant of summary judgment. Fed. R. Civ. Pro. 56(e).

The Court need only consider the cited materials, Fed. R. Civ. Pro. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them." *Johnson v. Cambridge Indus.,* 325 F.3d 892, 898 (7th Cir. 2003). Furthermore, reliance on the pleadings or conclusory statements backed by inadmissible evidence is insufficient to create an issue of material fact on summary judgment. *Id.* at 901.

The key inquiry, then, is whether admissible evidence exists to support a plaintiff's claims, not the weight or credibility of that evidence, both of which are assessments reserved to the trier of fact. *See Schacht v. Wis. Dep't of Corrections,* 175 F.3d 497, 504 (7th Cir.1999). When evaluating this inquiry, the Court must give the non-moving party the benefit of all

reasonable inferences from the evidence submitted and resolve "any doubt as to the existence of a genuine issue for trial . . . against the moving party." *Celotex,* 477 U.S. at 330.

### III.  Material Facts

The following statement of facts was evaluated pursuant to the standards set forth above.

Keaton and Zook were involved in a relationship for a few years prior to March 2008. The relationship began when Zook was 19 years old and Keaton was 41. Zook ended her relationship with Keaton in March 2008.

In December 2008, Zook changed her telephone number because Keaton refused to stop calling her.[1] Keaton and Zook have not spoken on the phone since March 2008 when Zook changed her cell phone number. Shortly after she changed her telephone number, Zook's landlord informed her that they had received faxes from Le C. Hook, a private investigator, requesting the name and telephone number of the tenant living in her unit.[2]

Keaton continued to contact Zook by email. Zook warned Keaton that she would tell Dean Leonard Fromm, the Dean of Student Affairs of the Indiana University Maurer School of Law, of Keaton's refusal to stop contacting her. On June 8, 2009, Dean Fromm wrote to Keaton on Zook's behalf and asked him to discontinue all contacts with Zook, a then-current law student. Fromm wrote that if he did not comply immediately, Fromm would help Zook pursue other action. Keaton's response to Dean Fromm's correspondence, which Keaton shared via electronic mail with Zook, stated: "you are not in a position to ask me to refrain our mutual

---

[1] Keaton attempts to dispute this fact. However, he is not in a position to challenge Zook's testimony regarding her motivation for changing her phone number. In addition, Keaton admits in his affidavit that "[t]here were times when she was angry with me and she would assert that she didn't want to speak with me, but that was the kind of thing we had both told each other thousands of times." Dkt. 216 at ¶ 11.

[2] Keaton denies having anything to do with the faxes. Keaton testified, however, that he gave Hook Zook's address and old phone number and her father's address and phone number (because Zook's father paid for her cell phone service) and asked him to look her up on a publicly available database. If Hook obtained Zook's number, Keaton offered to pay him $30.00. Dkt. 216 at ¶ 18.

contact and you have been deceived. Dean Fromm, I know Ms. Zook, and I know how she can spin a story." Dkt. 136-3, Ex. C-8. Dean Fromm suggested that Zook contact the prosecuting attorney of Monroe County for assistance and provided her with the name and contact information for Jacqueline Dakich, deputy prosecuting attorney. Dakich referred Zook to the Indiana University Police Department ("IUPD") for assistance.

Zook met with IUPD Officer Slone in July 2009 to discuss Keaton's conduct. Slone advised Zook to send Keaton an email directing him to stop emailing her and contacting her. On July 17, 2009, Zook sent Keaton an email which stated: "Stop contacting me. This is just more proof to help me pursue charges against you." Dkt. 223-3 at ¶ 2. Between July 17, 2009, and August 19, 2009, Keaton sent Zook 51 emails. *Id.* at ¶ 3.

Zook did not respond to Keaton's emails until August 19, 2009, when at about 2:40 p.m., she sent Keaton an email (blind copied to Slone at IUPD), that stated "Mark, Stop contacting me. Do not contact me via email, phone, in person, or through my friends. I have already been in contact with the police and I will be filing an official report if this does not stop." Dkt. 136-3 Ex. C-11.

Keaton responded to Zook's email approximately four minutes after it was sent: "That's fine. . . . You are in contact with the police because I sent you an email. That's a laugh. There is nothing wrong with sending someone an email." Keaton threatened to send Zook's then-current boyfriend an email disclosing personal information from Zook's and Keaton's relationship: "I want him to know things. [I] was willing to [be] persuaded not to, if you were ready to be a moral human being. You are not. You have threatened me with the 'police.'" Zook forwarded this first email to the IUPD. *Id.*; Ex. C-12.

5

Eight minutes later at 2:52 p.m., Keaton sent another email to Zook, again threatening to send an email to Zook's then-current boyfriend and using the threat as blackmail to make Zook contact Keaton: "If you rethink your position, before I transmit this, let me know." Zook forwarded this second email to the IUPD. *Id.*; Ex. C-13.

Keaton's next email to Zook was sent twenty-six minutes later at 3:18 p.m. It reiterated his threat to email Zook's boyfriend and demanded that Zook contact him: "I don't need your permission to send an email to him. If you would like to discuss it beforehand, if you think I should not send it, you can respond to this email. . . . I will respect your desire not to communicate with me. You have no authority at all to insist that I not share the truth with anyone else. That's a gift that only I can give you. If you want such a gift, earn it." Zook forwarded this third email to the IUPD. *Id.* Ex. C-14.

Eighteen minutes later at 3:36 p.m., Keaton sent Zook an email from a different email address, entitled "Now" and containing no text. *Id.*; Ex. C-15. This was apparently a reference to his prior threats to send the email to Zook's then-current boyfriend. Zook forwarded this fourth email to IUPD.

Forty-six minutes later at 4:22 p.m., Keaton sent yet another email reiterating his threat: "You want it sent. You want him to know. You want everyone to know. You want to be the victim, but you also want something to happen to force you to get help . . . Do you want to see what he will receive?" Zook forwarded this fifth email to IUPD. *Id.* Ex. C-16. Twenty-seven minutes later at 4:49 p.m., Keaton sent another email which stated: "Think of the consequences of responging. [sic] Think of the consequences of not responding." Zook forwarded this sixth email to IUPD. *Id.*; Ex. C-17.

Four minutes later, at 5:53 p.m., Keaton sent his seventh email responding to Zook's request not to contact her, which Zook forwarded to IUPD:

> Get right with God. . . . you have seen how fragile life is. Do not burn for all eternity because you cannot admit how evil you have been. Repent. Do not draw so many others into unwitting evil as you have done. Innocent people to whom you have lied about me are tainted with an evil that will send them to hell as well, if they never seek the truth and never learn it from you. We all have a duty to do right by others, and you are fostering evil behavior towards me by others.
>
> You are ill and you know it and have always known it.
> Tell me, Christine. What's right and wrong? Doesn't Jake deserve the truth? Can you fault a good man for telling him the truth? He needs to know the truth. FIX IT NOW.

*Id.;* Ex. C-18.

Detective Hannum became involved on August 19, 2009, when Sgt. Slone asked him to telephone Keaton. Slone provided Hannum with the email in which Zook asked Keaton to cease contacting her and the emails which Keaton had sent to Zook in response. At 6:00 p.m., Hannum called Keaton and explained to Keaton that he needed to stop contacting Zook and the person Zook was dating. Hannum stated that if Keaton continued to contact Zook, charges would be filed against him and he would be arrested. Hannum specifically instructed Keaton to stop sending Zook email messages.

In response, Keaton told Hannum that sending emails was not harassment nor against the law. Keaton explained that he and Zook emailed frequently and that if she was receiving emails from Keaton it was because she wanted to receive them. Keaton stated that he could speak to anyone he wanted concerning Zook. Keaton also acknowledged that he had sexually explicit photographs of Zook. Keaton told Hannum that Zook had a history of mental health issues and false stalking allegations and offered names of people who could provide Hannum with additional information. Keaton eventually said that he would have no more contact with Zook.

However, at 9:00:59 p.m. and 9:14:09 p.m., Keaton again emailed Zook. Dkt. 136-3; Ex. C-19; Ex. C-20. These emails escalated his threats to include his impending suicide in an attempt to get Zook to contact him. At 9:00:59 p.m., Keaton sent:

> What you have done is shameful. Utterly shameful. . . . I have done nothing wrong. . . . This is your last chance to apologize to me, Christine. All the IU cop said was that if you got a protective order and if I violated it, it would be a problem. But you do not have one and you cannot get one. And you cannot get one because you have never been threatened or harassed. And you have made no attempt because you know that all evidence would be relevant. If you mentioned that the gravamen of emails was the pictures . . . You'd have to tell the judge, and you would get a ruling that they are in the public domain because they are public and you dessimated [sic] them. And your mental health records would be at issue, which the cop now knows. . . . And there is nothing improper about emails to other people. . . . You would lose a motion for protective order. You would damage your reputation and perhaps your career. . . . But as a lawyer, I encourage you to try. I tell you it will be too late. Tonight will be too late. I want to die if there are people in the world like you. Do you understand that you love me? Apologize and fix this, or win in the way that you do not want to win. I'm tired of a world in which such disordered personality can attempt to destroy a man so good and moral and kind and loving. I have made my arrangements, written my letters, locked my doors. No one but you at this point can find me or reach me by phone. You and your friends just experienced the death of a loved one. Will you go that far, Christine? I promised the IU cop you wouldn't ever hear from me again. You will not, absent a response. If your shame and my life are no longer factors in your mind, do not respond.

*Id.;* Ex. C-19. At 9:14:09 p.m. Keaton sent:  "I am leaving my computer. I will not check it again. You can reach me by phone. It is your last chance. Do what is right. I will wait some period of time for you, but not beyond midnight." *Id.,* Ex. C-20.

After receiving these threats by Keaton to commit suicide, Zook contacted the IUPD to let them know of his contacts and to alert them to Keaton's suicide threat. Hannum called Keaton and asked whether Keaton was going to harm himself. Keaton assured Hannum that he was not going to harm himself.

8

Hannum again reiterated his instruction to Keaton not to contact Zook. Keaton told Hannum that since Zook had not obtained the protective order yet, he had not committed any crime and he could email her if he wanted. Keaton told Hannum that he is a lawyer and knows how protective orders work. Keaton stated that he did not think Zook would actually get a protective order because she did not really want one; she would not want private information about her becoming public; and because she could not show that Keaton is a threat to her physical safety. Keaton stated that he had not been near Bloomington, Indiana, where Zook lived since the fall of 2008. Hannum then told Keaton there was a possibility that this matter could be brought to the attention of the Indiana Disciplinary Commission. Keaton then said he would not have any further contact with Zook. After his second discussion with Keaton that day, Hannum did not believe Keaton would stop contacting Zook.

Keaton stopped contacting Zook for a short period of time, but in November 2009, Keaton began contacting her again via electronic mail and Facebook. Keaton sent Zook emails and Facebook messages from 17 different accounts. Dkt. 136-3; Zook Aff. ¶ 19. He sent 55 messages in November, 26 in December 2009, 43 in January 2010, 68 in February, 139 in March, and 40 in April 2010. *Id.*

Keaton created and maintained a blog about Zook which included explicit photographs of Zook. The only time Zook contacted Keaton after April 19, 2009, was on March 4, 2010, when she asked Keaton to remove the blog or to remove her name and photographs from the blog.

Zook again contacted IUPD in April 2010 regarding Keaton's contacts and threats.  On April 21, 2010, Keaton applied for a protective order in the Monroe County Circuit Court. That same day, Zook met with Det. Hannum to discuss Keaton's persistent contacts and threats. Zook provided Hannum copies of more than forty emails Zook had received from Keaton between

9

November 2009 and April 2010 in which Keaton made threats to Zook in an attempt to force her to contact him. Dkt. 136-3; Ex. C-20 through C-61. The threats included:

1.  Suicide. For example, "I've taken enough pills to do the trick. . . . if you love me, you can reach Cindy." "I will kill myself if I do not hear from you by 6:30," *Id.* at Ex. C-28.

2.  Posting explicit photographs or sending those photographs to Zook's friends or family. For example, "If you are willing . . . to explain[] what . . . has happened, I will do whatever you want with [the photographs]," *Id.* at Ex. C-28. "If I do not hear from you . . . I'll stop emailing and . . . tell my story, proclaim it, and be done." *Id.* at Ex. C-32. "[I]f you aren't courteous enough to respond to me by the time publication hits search engines, I will not be in contact with you." *Id.* at Ex. C-27. "Get in touch with me. Family. Classmates." *Id.* at Ex. C-61. "Get in touch with me. How many will read about you?" *Id.* at Ex. C-46.

3. General statements that Keaton would retaliate against Zook if she did not contact him. For example, "Hell gapes open for you, Christine. Only God can save you. And how little time you have." *Id.* at Ex. C-30. "You make the decision to ignore me for the next hour, and I will make a decision that allows me to express my fury." *Id.* at Ex. C-40. "Call me! . . . This is the last opportunity you have to avoid a catastrophe." *Id.* at Ex. C-49.

On April 21, 2010, Zook also provided Hannum with a disc of the voicemail messages that Keaton left for Zook from March 2008 to July 2008. Each voicemail was a separate file and the file name included the date and time the voicemail was left by Keaton. Dkt. 223-3; Zook Supp. Aff. ¶ 17. Hannum created a copy of the voicemail messages. The recorded messages from Keaton included threatening statements that Keaton would "make [Zook] pay," that Keaton would "show no mercy," that if Zook did not call Keaton she would "earn retaliation," and that if

Zook did not return Keaton's call that "[e]very day of [her] life [would] be a f***ing[3] living hell." *Id.*

In addition, Zook gave Hannum screenshots of a Facebook profile which she believed was created and maintained by Keaton under the name John Logan and screenshots of websites on which Keaton had posted explicit photographs of her.[4] Zook told Hannum that Keaton's threats and persistent contact caused her to feel emotional distress.

After reading the emails and listening to the voicemail recordings, Hannum believed that Keaton was disturbed and unstable and could be a physical threat to Zook. Dkt. 136-2, Ex. B, Hannum Aff. ¶ 8. Hannum noted that in one voicemail Keaton admitted to physical violence against Zook. Keaton stated: "When I think about the f***ing times I beat the shit out of you, you know what, it was with absolute f***ing hatred. Every f***ing time I hit you, I f***ing hit you with f***ing disgust in my heart because you were such a pathetic loser." (July 7, 2008, 3:40 p.m., dkt. 136-2 at p. 10 and p. 79).

Hannum also obtained two faxes sent from Le C. Hook Investigations to Zook's landlord requesting the phone number and identity of the tenant living in Zook's unit, dkt. 136-2 at p. 84-85, and two emails from Keaton to Zook explaining Hook's faxes dated February 24, 2009. In the emails Keaton admits that he contacted Hook to obtain Zook's cell phone number. Keaton writes:

> Hook is a client. He also runs a security business. He does service of process, that kind of thing. I've been looking for a way to shoot him some business, serve some subpoenas, that kind of thing.

---

[3] The vulgar language used by Keaton in his emails and messages to Zook has been abbreviated by the Court.
[4] Keaton denies that he posted the explicit photos of Zook on three of the four websites disclosed during discovery in this case. "With respect to the fourth site, I do not believe that I posted the photographs at issue during the time period at issue." Dkt. 216 at ¶ 76.

> When you changed your number, I wanted your number. Obviously. It was mean of you and you did it to piss me off and hurt me. . . . I approached him and asked one thing. I asked if there was a legally available cell phone database that might have your new number. . . . He told me there were databases and that he could try. I asked how much. He told me if he got the information, I'd pay him the cost of the search; if he came up empty, I wouldn't have to pay.

Dkt. 136-2 at Ex. B-52 and Ex. B-53.

On May 22, 2010, Hannum prepared a probable cause affidavit, which he forwarded to the Monroe County Prosecutor's Office.[5] Hannum testified that everything he stated in the probable cause affidavit was accurate to the best of his knowledge and that he did not intentionally omit any material facts that he knew would negate probable cause.

The Prosecutor, Jackie Dakich, determined that probable cause existed to charge Keaton with stalking and filed Hannum's Probable Cause Affidavit for a Judge's review. Dkt. 136-4. A warrant was issued for Keaton's arrest and charges were filed in the Monroe Circuit Court against Keaton for stalking. Dkt. 136-5 (Certified Copy of Arrest Warrant); Dkt. 136-6 (Certified Copy of Information).

## IV. Discussion

As noted above, Keaton alleges that Officer Hannum and Sgt. Slone were responsible for Keaton's false arrest (Count I), and for violating Keaton's equal protection (Count III) and First Amendment rights (Count IV). The defendants seek summary judgment. They argue that probable cause serves as a bar to Keaton's false arrest, equal protection, and First Amendment claims and that they are entitled to qualified immunity.

---

[5] *See* Probable Cause Affidavit, which has been attached to this Entry as Exhibit A to assist the reader. *See also* Dkt. 136-2 at Ex. B-54.

**A.  Sgt. Slone**

Sgt. Slone is entitled to summary judgment because there are no facts which could support a claim that she violated any of Keaton's constitutional rights. *See Burks v. Raemisch,* 555 F.3d 592, 593-94 (7th Cir. 2009)("Section 1983 does not establish a system of vicarious responsibility. Liability depends on each defendant's knowledge and actions, not on the knowledge or actions of persons they supervise. . . . *Monell's* rule [is that] public employees are responsible for their own misdeeds but not for anyone else's.")(citing *Monell v. New York City Dep't of Social Services,* 436 U.S. 658 (1978)). Keaton's complete lack of supporting evidence as to any claim of wrongdoing against Sgt. Slone entitles her to summary judgment on all claims.

**B.  Det. Hannum -- False Arrest Claim**

In Count I of his amended complaint, Keaton alleges that Hannum violated his right to be free from unlawful arrest. Dkt. 7 at p. 4. Keaton argues that the "defendants procured a warrant for his arrest through Hannum's brazenly false affidavit." Dkt. 215 at p. 12. Keaton argues that nearly every fact alleged by Hannum in his probable cause affidavit was false, that he knew the facts were false, and that Hannum intentionally omitted facts which would have negated probable cause. In other words, Keaton asserts that Hannum violated his constitutional rights by causing him to be arrested without probable cause. The defendants argue that they are entitled to summary judgment because probable cause existed for the charge of stalking and for the additional charges of intimidation and harassment suggested by Hannum in his probable cause affidavit.

**1.    Probable Cause**

Because Keaton's arrest was made pursuant to a facially valid warrant issued by a judicial officer, Hannum violated Keaton's rights only if a reasonably well-trained officer in his

position should have known that the testimony or affidavit he provided in support of the warrant would have failed to establish probable cause, such that he should not have applied for the warrant in the first place. *See Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 742 (7th Cir. 2003) (*Malley v. Briggs*, 475 U.S. 335, 345 (1986)).

Probable cause is only a probability or substantial chance of criminal activity, not a certainty that a crime was committed:

> In determining whether information submitted to a judicial officer in support of a warrant application was sufficient to establish probable cause, we look only at what the officer knew at the time he sought the warrant, not at how things turned out in hindsight. The complaint of a single witness or putative victim alone generally is sufficient to establish probable cause to arrest unless the complaint would lead a reasonable officer to be suspicious, in which case the officer has a further duty to investigate. And in crediting the complaint of a reasonably believable witness or putative victim, the police are under no constitutional obligation to exclude all suggestions that the witness or victim is not telling the truth.

*Beauchamp,* 320 F.3d at 743 (internal citations omitted). In this case, probable cause existed if, at the moment Det. Hannum signed the probable cause affidavit, the facts and circumstances within his knowledge and of which he had reasonably trustworthy information were sufficient to warrant a prudent person in believing that Keaton had committed the crime of stalking, intimidation or harassment. *See id.*

"A warrant request violates the Fourth Amendment if the requesting officer knowingly, intentionally, or with reckless disregard for the truth, makes false statements in requesting the warrant and the false statements were necessary to the determination that a warrant should issue." *Knox v. Smith*, 342 F.3d 651, 658 (7th Cir. 2003). The Seventh Circuit has "said that a 'reckless disregard for the truth' can be shown by demonstrating that the officer 'entertained serious doubts as to the truth' of the statements, had 'obvious reasons to doubt their accuracy,' or

failed to disclose facts that he or she 'knew would negate probable cause.'" *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012) (quoting *Beauchamp,* 320 F.3d at 743).

### 2.    Qualified Immunity

The probable cause standard inherently allows room for reasonable mistakes. Qualified immunity affords an even greater level of protection by shielding officers from suit for damages if a reasonable officer could have believed the arrest to be lawful, in light of clearly established law and the information the arresting officers possessed. *Gutierrez v. Kermon*, 722 F.3d 1003, 1008 (7th Cir. 2013). "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Seventh Circuit has explained:

> In this context, qualified immunity provides shelter for officers who have "arguable probable cause" to arrest—i.e., those officers that reasonably but mistakenly believe they have probable cause.  *See Abbott* [*v. Sangamon County, Ill.*], 705 F.3d [706,] 714–15, 723–24 [(7th Cir. 2013)]; *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998). Though they may appear to be the same, the probable-cause and arguable-probable-cause inquiries are different. *Fleming v. Livingston County, Ill.*, 674 F.3d 874, 880 (7th Cir. 2012). An arrest without probable cause is a violation of a constitutional right, whereas an arrest without arguable probable cause is a violation of a "clearly established" constitutional right. *See Hunter*, 502 U.S. at 227; *McComas v. Brickley*, 673 F.3d 722, 725 (7th Cir. 2012).

*Gutierrez,* 722 F.3d at 1008.

### 3.    Crime of Stalking

"Whether an officer has probable cause to arrest depends on the requirements of the applicable state criminal law." *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 761 (7th Cir. 2006)

(citing *Williams v. Jaglowski*, 269 F.3d 778, 782 (7th Cir. 2001)). Indiana law defines stalking as:

> a knowing or an intentional course of conduct involving repeated or continuing harassment of another person that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened and that actually causes the victim to feel terrorized, frightened, intimidated, or threatened.

Ind. Code § 35-45-10-1. The Indiana statute on stalking defines harassment[6] as

> conduct directed toward a victim that includes but is not limited to repeated or continuing impermissible contact that would cause a reasonable person to suffer emotional distress and that actually causes the victim to suffer emotional distress.

Ind. Code § 35-45-10-2.

### 4.    Probable Cause Affidavit

Det. Hannum seeks summary judgment on the basis that his probable cause affidavit was accurate to the best of his knowledge and that he did not intentionally omit any material fact that he knew would negate probable cause, nor did Hannum intend to deceive the court in any manner. Keaton tries to create a material fact in dispute regarding whether Hannum "knowingly or with reckless disregard for the truth" made false or misleading statements in the probable cause affidavit he signed and which was submitted in support of the prosecutor's application for an arrest warrant.

As reflected in the probable cause affidavit, the facts and circumstances within Hannum's knowledge and of which he had reasonably trustworthy information were sufficient to warrant a prudent person believing that Keaton had committed the crime of stalking. *See* Ex. A attached. The affidavit reflects that Keaton (1) knowingly or intentionally, (2) engaged in a course of conduct involving repeated or continuing harassment of Zook, (3) that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened, and (4) that actually caused Zook

---

[6]   As opposed to the separate crime of Harassment under Indiana Code § 35-45-2-2.

to feel terrorized, frightened, intimidated, or threatened. *See Nicholson v. State*, 963 N.E.2d 1096, 1100 (Ind. 2012)(discussing elements for stalking conviction).

Stalking in Indiana does not require in-person contact or threats of physical violence. When a person continues to call or email without the recipient's consent or in disregard of the recipient's expressed wish that contact be discontinued, the messages are clearly "impermissible contact." *See Van Horn v. State*, 889 N.E.2d 908, 911-912 (Ind. Ct. App. 2008) ("[T]elephone calls or messages impinge on the recipient's zone of personal privacy, access to which the recipient has every right to deny or grant permission."). Moreover, Indiana courts have specifically found that contacts by email and messaging can constitute stalking. *Andrews v. Ivie*, 956 N.E.2d 720, 725 (Ind. App. 2011) ("[W]e have no reluctance in holding that Andrews's contacts with Ivie via gifts, emails, texts, and Facebook messages constituted repeated or continuing harassment sufficient to support a finding of stalking."); *Smith v. State*, 802 N.E.2d 948, 954 (Ind. Ct. App. 2004) ("[T]elephone messages, without more, may amount to "impermissible contact" sufficient to support a stalking conviction.").

Keaton's repeated impermissible contacts with Zook were clearly made knowingly and intentionally because they followed communications to Keaton by Zook, Dean Fromm, and twice from the IUPD that Keaton should stop contacting Zook. The "repeated" element of Indiana's stalking statute may be satisfied by two or more impermissible contacts. *Johnson v. State*, 721 N.E.2d 327, 332-33 (Ind. Ct. App. 1999) ("[T]he term 'repeated' in Indiana's anti-stalking law means 'more than once.'").

Keaton argues that Zook could have blocked his incoming emails sent from a specified email address if she did not want to read them. Keaton argues that because Zook had blocked Keaton's emails in the past and knew how to do so, he was entitled to believe that Zook would

not receive or read any emails from Keaton unless she wanted to. Unfortunately for Keaton, however, Indiana law does not require an alleged stalking victim to take affirmative steps to protect herself from her stalker. In addition, Hannum had evidence that Zook could not escape Keaton's harassment and intimidation by blocking Keaton's email address as he suggests--he emailed her or sent Facebook messages from seventeen different email addresses with the apparent purpose of circumventing any attempts to block his messages.

Hannum also had enough information to support his determination that a reasonable person would feel intimidated or threatened by Keaton's contacts and that Zook did feel intimidated or threatened. In many of the fifty-one Keaton emails that Zook provided to the IUPD, Keaton threatened to post to the internet explicit photographs of Zook, to send those photographs to her friends or family, to disclose Zook's personal information to friends or family, or to commit suicide if she did not respond to him. Forty of the fifty-one emails Zook provided to the IUPD and Hannum were sent by Keaton after he was instructed not to by Zook and Hannum.

Additionally, the voicemails that Keaton left for Zook, which Hannum listened to, contained threats that Keaton would "make [Zook] pay," that Keaton would "show no mercy," that if Zook did not call Keaton she would "earn retaliation," and that if Zook did not return Keaton's call "[e]very day of [her] life [would] be a f***ing living hell." Dkt. 136-2 at ¶¶ 8-9. These statements by Keaton would cause a reasonable person to feel threatened and intimidated. Zook did feel threatened or intimidated and she conveyed this to the IUPD.

Keaton suggests that Hannum "lied" in his affidavit when he included information which he learned from Zook. Keaton argues that the "affidavit reports pure uncorroborated hearsay from Zook." *See* dkt. 215 at p. 15. But relying on hearsay in a probable cause affidavit is

appropriate. *Franks v. Delaware,* 438 U.S. 154, 165 (1978) ("probable cause may be founded upon hearsay and upon information received from informants. . . ".); *U.S. v. Ventresca*, 380 U.S. 102, 108 (1965) ("hearsay may be the basis for issuance of the warrant" so long as there is a substantial basis for crediting the hearsay). Moreover, "[w]here a victim of a crime supplies the police with the information forming probable cause, there is a presumption that this information is inherently reliable." *Johnson v. Saville*, 575 F.3d 656, 660 (7th Cir. 2009).

Similarly, there is no requirement that the probable cause affidavit attach the actual messages or their content as Keaton argues. Dkt. 15 at p. 23. The "best evidence rule" simply does not apply. "[A] finding of 'probable cause' may rest upon evidence which is not legally competent in a criminal trial." *Ventresca*, 380 U.S. at 107-108. There is simply no evidence that Hannum was not "truthful" in the sense that the information he put forth was believed or appropriately accepted as true. *See id.*

In addition, Keaton argues that Hannum's statement that Keaton made threats is designed to mislead. This argument is frivolous. The probable cause affidavit specifically states that Hannum reviewed more than forty email messages most of which make threats of suicide or retaliation if Zook does not contact Keaton. Any number of communications from Keaton that Zook provided Hannum can reasonably be seen as Keaton's intent to harass, annoy, or alarm Zook with no intent of legitimate communication. The emails alone include, but are not limited to:

    a.  "Would you like the links to the web sites? There are eight. I'm happy to send them to you." (November 16, 2009, 11:57 p.m.). Dkt. 136-2 at Ex. B-9.

    b.  "Tell me, Christine, are the existence of the photographs a factor as to why you will not apologize, will not engage in a rational dialogue with me? If you are willing and capable of being genuine, explaining what on earth has happened, I will do whatever you want with them." (November 27, 2009, 1:23 a.m.) *Id.* at Ex. B-12.

c.  "If you want to follow the blog, you can let me know. I'll send you the link. It takes a while before it appears on google, I guess. Once it does, you'll be able to find it, I guess." (January 7, 2010, 6:29 p.m.) *Id.* at Ex. B-14.

d.  "You know, if you aren't courteous enough to respond to me by the time publication hits search engines, I will not be in contact with you." (January 16, 2010, 8:32 p.m.) *Id.* at Ex. B-15)

e.  "I've taken enough pills to do the trick. If you have any morality, if you love me, you can reach Cindy. . . For a long time, I told my friends that if [or] when this happens, if you suddenly appeared at a funeral, thinking that you suddenly loved me and needed to grieve that you should not be allowed to attend. . . . I love you. I would say always, but always is ending. Not because my love fades, but because I am going." (January 20, 2010, 11:21 p.m.) *Id.* at Ex. B-16.

f.  "Hell gapes open for you, Christine. Only God can save you. And how little time you have. I wash my hands of you." (February 10, 2010, 10:38 a.m.) *Id.* at Ex. B-17.

g.  "I had hoped that seeing the truth in a medium other than email might wake you up, shake you from your self-imposed slumbers. . .  But when the world learns the truth about you, Christine, when your father reads about you, or your family, or anyone in the law, you will not be able to complain to me. I gave you an opportunity to speak to me." (February 14, 2010, 2:59 p.m.) *Id.* at Ex. B-19.

h.  "Understand, too, that I am quite aware that I not only have the authority to post the blog, but I have the authority to invite anyone either of us knows to read it. And I intend to. I want everyone to know what you've done. And I will make sure that they do. And I will see to it that this happens today. I would rather get an explanation and an apology from you." (March 19, 2010, 6:26 p.m.) *Id.* at Ex. B-25.

i.  "You make the decision to ignore me for the next hour, and I will make a decision that allows me to express my fury." (March 20, 2010, 12:06 p.m.) *Id.* at Ex. B-27.

j.  "Consider what life would feel like if Bloomington read the blog today. Consider the rest of life that way. Consider responding to my emails and just f***ing apologizing. Which life is better? Which more moral anyway. One f***ing hour!" (March 20, 2010, 12:15 p.m.) *Id.* at Ex. B-28.

k.  "Are you reading my f***ing emails. I'm telling you: I want you to respond. If you don't, then so be it. But I am just beside myself with disgust and anger. You have such audacity. But you're also just being stupid. Do you think attempts to blame me after what happens today will make a bit of difference?" (March 20, 2010, 1:11 p.m.) *Id.* at Ex. B-29.

l.  'GET IN TOUCH WITH ME NOW! I'M NOT F***ING KIDDING." (Capital letters in original.) (March 23, 2010, 12:01 p.m.) *Id.* at Ex. B-30.

20

m. "Get in touch with me. How many will read about you? Apologize to me!" (March 24, 2010, 11:18 a.m.) *Id.* at Ex. B-33.

n. "Call me! Now! It's an emergency. This is the last opportunity you have to avoid a catastrophe. I am sick of this madness. You'll never ever forgive yourself if you do not call me. Put everything aside. Telephone me!" (March 26, 2010, 12:40 a.m.) *Id.* at Ex. B-36.

o. "If you get in touch with me and have a rational conversation, I will delete the blog and everything else. If you get in touch with me and get to the bottom of this, I'll delete every photograph I have." (March 27, 2010, 11:52 a.m.) *Id.* at Ex. B-38.

p. "I will kill myself if I do not hear from you by 6:30." (April 8, 2010, 5:42 p.m.) *Id.* at Ex. B-43.

q. "I am suicidal Christine. I am suicidal. I am suicidal. Please contact me." (April 8, 2010, 10:38 p.m.) *Id.*

r. "Get in touch with me. Family. Classmates." (April 19, 2010, 6:58 p.m.) *Id.* at Ex. B-46.

The emails, along with the voicemails, clearly establish probable cause that Keaton had threatened Zook.

Keaton's assertion that he was entitled to threaten Zook that he would publish, release, or further disseminate pornographic photographs of her unless she met his demands defies understanding. Keaton goes so far as to suggest that if the judge reviewing the probable cause affidavit would have known the circumstances surrounding his possession of the photographs that he "would have very little sympathy for Zook" is frivolous given the context of Keaton's emails. *See* dkt. 230-1 at p. 18. Keaton was using the photographs to blackmail Zook into reconciling with him. This is true regardless of the circumstances under which Keaton came into possession of the photographs or what the photographs depicted. Keaton denies ever using possession of the explicit photographs to force Zook to do anything against her will or to reconcile with him but Keaton's email messages directly contradict this claim. *See* dkt. 216 at ¶

21

47. Under these circumstances Det. Hannum was not obligated to accept Keaton's version of the facts nor would it have been reasonable for him to do so.

Finally, once probable cause exists, officers are under no obligation to investigate further. Hannum was not required to investigate every potentially exculpatory detail raised by Keaton. "While an officer may not close his or her eyes to clearly exculpatory facts, the Fourth Amendment does not require an officer with probable cause to arrest to wait while pursuing further investigation." *Stokes v. Board of Educ. of the City of Chicago,* 599 F.3d 617, 624 -625 (7th Cir. 2010); *see also McBride v. Grice*, 576 F.3d 703, 707–08 (7th Cir. 2009) (officer had probable cause to arrest both participants in a physical altercation after talking to participants and viewing an inconclusive surveillance video; officer had no duty to interview witnesses or to examine additional evidence); *Mustafa v. City of Chicago*, 442 F.3d 544, 548 (7th Cir. 2006) (affirming summary judgment for officers; police have no duty to investigate extenuating circumstances or to search for exculpatory evidence once they have probable cause to arrest).

"In this circuit the allocation of the burden of persuasion in a § 1983 case claiming a Fourth Amendment violation is clear: a plaintiff claiming that he was arrested without probable cause carries the burden of establishing the absence of probable cause." *McBride,* 576 F.3d at 706; *see also Hartman v. Moore*, 547 U.S. 250 (2006) (holding that a plaintiff in a retaliatory prosecution claim must prove the absence of probable cause). Keaton has not met this burden. Hannum was justified in concluding that there was "more than a reasonable chance—less than a 50 percent likelihood can be sufficient—that a crime occurred and the suspect committed it." *Nelson v. Vill. of Lisle*, 437 Fed. Appx. 490, 493 (7th Cir. 2011).

Given the undisputed evidence in this case, no reasonable jury could find that Det. Hannum knowingly or with reckless disregard for the truth made false statements in his affidavit,

without which probable cause for the arrest warrant would not have existed.[7] Because probable cause existed for Keaton's arrest, Keaton's false arrest claim fails as a matter of law. In addition Hannum is entitled to qualified immunity. Det. Hannum is entitled to summary judgment on Keaton's false arrest claim.

### C.  Det. Hannum -- Class of One Equal Protection Claim

Keaton's equal protection claim, set forth in Count III of his amended complaint, alleges that Keaton was treated differently than others in retaliation for the exercise of his First Amendment rights such that the decision to arrest him deprived him of his Fourteenth Amendment right to equal protection. To state a so-called "class-of-one" equal protection claim, Keaton must allege that he was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Geinosky v. City of Chicago*, 675 F.3d 743, 747 (7th Cir. 2012) (recognizing that such a claim can be asserted based on the irrational or malicious application of law enforcement powers) (*citing Engquist v. Oregon Dept.*

---

[7] "[I]n § 1983 actions for false arrest, probable cause need not have existed for the charge for which the plaintiff was arrested, so long as probable cause existed for arrest on a closely related charge." *Biddle v. Martin*, 992 F.2d 673, 676 (7th Cir. 1993). Based on the facts set forth above, probable cause also existed that Keaton committed the crime of harassment against Zook. Indiana Code § 35-45-2-2 states, in relevant part, that "a person who, with intent to harass, annoy, or alarm another person but with no intent of legitimate communication:  (1) makes a telephone call, whether or not a conversation ensues; . . . or (4) uses a computer network . . . or other form of electronic communication to:  communicate with a person; or transmit an obscene message or indecent or profane words to a person; commits harassment, a Class B misdemeanor." Further, the statute defines a message as "obscene" if: (1) the average person, applying contemporary community standards, finds that the dominant theme of the message, taken as a whole, appeals to the prurient interest in sex; (2) the message refers to sexual conduct in a patently offensive way; and (3) the message, taken as a whole, lacks serious artistic, literary, political, or scientific value. *Id.*

Probable cause also existed that Keaton committed the crime of intimidation against Zook. Indiana Code § 35-45-2-1 states, in relevant part, that "a person who communicates a threat to another person, with the intent . . . that the other person engage in conduct against the other person's will . . . commits intimidation." "Threat" is further defined as an expression "of an intention to . . . unlawfully injure the person threatened" or "expose the person threatened to hatred, contempt, disgrace, or ridicule."

*of Agriculture*, 553 U.S. 591, 601 (2008); *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

A class-of-one equal protection claim like Keaton's requires at a minimum proof that the defendant intentionally treated Keaton differently from others situated similarly to him and that there was no rational basis for this difference in treatment. *Thayer v. Chiczewski*, 705 F.3d 237, 254 (7th Cir. 2012). "Like the false arrest claim, then, the class-of-one equal protection claim hinges on the notion that the authorities lacked probable cause to arrest [Keaton], as the existence of probable cause necessarily means that there was a legitimate reason to arrest [him]." *Williamson v. Curran,* 714 F.3d 432, 448-449 (7th Cir. 2013). This claim consequently fails for the same reason that the false arrest claim fails. Hannum had reasonable grounds on which to believe that Keaton was guilty of stalking, harassing or intimidating Zook. Hannum issued the probable cause affidavit on this basis and not for malicious or irrational reasons. Accordingly, he is entitled to qualified immunity and summary judgment in his favor on this claim.

### D.  Det. Hannum -- Free Speech Retaliation Claim

In Count IV of his amended complaint, Keaton claims Hannum retaliated against him for exercising his First Amendment rights. Det. Hannum argues that this claim fails factually and legally because Keaton was arrested with probable cause.

If probable cause exists, the arresting party's motives are irrelevant. The Supreme Court has stated that a police officer's motive does not invalidate "objectively justifiable behavior under the Fourth Amendment." *Whren v. United States*, 517 U.S. 806, 812 (1996) ("Not only have we never held . . . that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment; but we have repeatedly held and asserted the contrary.") "[S]ubjective intent alone . . . does not make otherwise lawful conduct illegal or unconstitutional." *Id.* at 813.

The Supreme Court "has never held that there is such a right" to be "free from a retaliatory arrest that is otherwise supported by probable cause." *Reichle v. Howards*, 132 S.Ct. 2088, 2094 (2012). "Probable cause, if not a complete bar to [a defendant's] First Amendment retaliatory arrest claim, provides strong evidence that he would have been arrested regardless of any illegitimate animus." *Thayer v. Chiczewski*, 697 F.3d 514, 529 (7th Cir. 2012) (citing *Reichle*).

For the reasons explained above, Hannum reasonably believed that there was probable cause for Keaton's arrest. Thus, he is entitled to qualified immunity on this basis and summary judgment is entered in favor of Hannum on this claim.

## V.  Conclusion

It has been explained that "summary judgment serves as the ultimate screen to weed out truly insubstantial lawsuits prior to trial." *Crawford-El v. Britton,* 118 S. Ct. 1584, 1598 (1998). This is a vital role in the management of court dockets, in the delivery of justice to individual litigants, and in meeting society's expectations that a system of justice operate effectively. Indeed, "it is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate. *Mason v. Continental Illinois Nat'l Bank,* 704 F.2d 361, 367 (7th Cir. 1983).

Keaton has not presented any evidence that Sgt. Slone was involved in the misconduct alleged and she is entitled to summary judgment on this basis. As to Det. Hannum, there is no evidence to suggest that a reasonably well-trained officer in his position should have known that the affidavit he provided in support of the warrant would have failed to establish probable cause, such that he should not have applied for the warrant in the first place. At the very least, Hannum is entitled to qualified immunity under these circumstances because he had arguable probable

cause upon which to base his probable cause affidavit. The existence of probable cause entitles Hannum to summary judgment as to all claims alleged against him.

Det. Hannum and Sgt. Slone are entitled to judgment as a matter of law. The motion for summary judgment [dkt. 135] is therefore **granted**.

This Entry does not resolve all claims against all parties. No partial final judgment shall issue at this time as to the claims resolved in this Entry.

**IT IS SO ORDERED.**

Date:   3/11/2014

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

MARK  KEATON
PO BOX 11208
Ft. Wayne, IN 46856

All Electronically Registered Counsel